# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

EDWARD KATES,

        *Petitioner*,

    v.

TERRY MOORE,
JOHN FARMER,

        *Respondents*.

Civ. Action No. 00-2729 (KSH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

    Before the Court is a petition for a writ of habeas corpus. *Pro se* petitioner Edward "Eddie" Kates challenges his 1991 state-court conviction for, *inter alia*, conspiracy, robbery, aggravated manslaughter, and felony murder. As the Court explains below, the petition lacks merit and will be denied.

## I.

### A.

    The following is a summary of the facts surrounding the robbery and fatal stabbing of Sylvester Martin, for which Kates and his co-defendants, Jackie Coley and Wallace "Heavy" Melvin, were tried and ultimately convicted.[1] The facts in this brief summary are drawn from the Appellate Division's opinion affirming Kates's conviction on direct appeal. Throughout this Opinion, the Court cites Kates's opening petition, the parties' supporting briefs and exhibits—

---

[1] Melvin and Coley's convictions were ultimately vacated. *See infra* note 7.

which include the trial transcripts[2]—and the available state-court decisions.[3]  Where necessary, the Court will supplement its factual summary in its analysis of petitioner's individual claims for relief.

In the early hours of October 18, 1990, Wendy Caldwell and Jackie Coley were working as prostitutes in the vicinity of 20th Street and Clinton Avenue on the border of Irvington and Newark, New Jersey.   Kates and Melvin were also nearby, providing the women with "protection."  At approximately 2:00 or 3:00 a.m., Martin, the decedent, solicited Coley to perform a sexual act in a nearby alley.  Coley agreed to this request, led him to the alley behind a local fish market, and searched him for weapons before commencing the sexual act.  The interlude lasted approximately five to ten minutes, after which Martin became frightened and jumped over a fence near the market.  On her way out of the alley, Coley ran into Kates, who asked her whether "the guy had any money."  She told Kates that Martin had paid her $40, and she then went to join Caldwell and Melvin further down the street.

Soon thereafter, Melvin approached two police officers, Michael Daniluk and Tim Williams, who were on patrol, and reported that a man had been stabbed behind the fish market. The officers followed him and discovered Martin lying on the ground with two stab wounds to his heart.  Paramedics were called and Martin was pronounced dead at the scene.  Meanwhile,

---

[2] Transcript references are cited herein using the volume number that corresponds to the particular trial day referenced.  For instance, the transcript for the first trial day is cited "1T:xx-yy," the second "2T:xx:yy," and so forth. The February 27, 1998 oral argument transcript on Kates's petition for state post-conviction relief is denominated as "7T:xx:yy."  Finally, the Court's references to "respondents" and the "State" are used interchangeably herein.

[3] Kates has submitted as exhibits the opinions and orders of the state-court decisions that are not available in online legal databases.  The Court cites the slip opinion and orders as they appear in Kates's submissions.

Caldwell, Coley, Melvin, and Kates gathered at a nearby gas station.  Kates was driving a car; Melvin got into the front passenger seat and the two women sat in the rear.  Kates left the Irvington/Newark area and proceeded toward a hotel on Route 1-9 in Elizabeth, New Jersey.

While en route to the hotel, Melvin exclaimed to Kates, "You didn't have to stab the man.  Why did you stab him?"  Kates replied, "Just shut up, you know, just shut up."  Kates also tossed $200 or $250 into the backseat of the vehicle and ordered Coley to "split it up" between herself, Kates, and Melvin.  Upon arriving at the hotel, where the four began to "get high," an argument ensued between Kates, Melvin, and Coley regarding the stabbing.  During the exchange, Coley and Melvin again admonished Kates that "[You] didn't have to stab the man," and that "you could have punched him or something, you didn't have to stab him," to which Kates replied "[J]ust shut the f*ck up, just shut the f*ck up."  At some point, Coley noticed a knife on the dresser of the hotel room, but no murder weapon was ever recovered.

### B.

On January 30, 1991, a Grand Jury sitting in Essex County, New Jersey returned a six-count indictment against Kates, Melvin, and Coley in the Superior Court of New Jersey, Law Division, Essex County, for crimes related to Martin's death.  Specifically, the indictment contained the following charges:

> (1)     Second-degree conspiracy to commit robbery, in violation of N.J.S.A. §§ 2C:5-2 and 2C:15-1;
>
> (2)     First-degree robbery, in violation of N.J.S.A. § 2C:15-1;
>
> (3)     First-degree felony murder, in violation of N.J.S.A. § 2C:11-3(a)(3);
>
> (4)     First-degree purposeful or knowing murder, in violation of N.J.S.A. § 2C:11-3(a)(1)-(2);

(5)     Fourth-degree possession of a knife under circumstances not manifestly appropriate for such lawful uses at it may have, in violation of N.J.S.A. § 2C:39-5(d); and

(6)     Third-degree possession of a knife with the purpose to use it unlawfully against another person, in violation of N.J.S.A. § 2C:39-4(d).

Kates, Coley, and Melvin were tried in a three-day joint trial in June 1991.  During opening remarks, the prosecutor once referred to Kates and Melvin as Coley and Caldwell's "pimps" when describing the foursome's activity on October 18, 1990.  Caldwell—who was not charged—testified with respect to, *inter alia*:  (1) Kates's presence at the crime scene on October 18, 1990 and in the car and hotel room afterward; (2) Melvin's reprimand to Kates in the car that he "didn't have to stab" Martin (and Kates's response to "shut up"); and (3) Coley and Melvin's similar rebuke to Kates in the hotel room (and Kates's response to "shut the f*ck up").  Coley took the stand and testified on her own behalf and, in doing so, implicated Kates.  She corroborated Caldwell's trial testimony that Melvin had asserted in the car that Kates "didn't have to stab" Martin.  Melvin did not testify.

As evidence of the cause of Martin's death, the State called Dr. Phito Pierre-Louis, an Assistant Essex County Medical Examiner, who conducted an autopsy of Martin's body.  Among other things, Dr. Pierre-Louis testified that Martin died of internal hemorrhages caused by two stab wounds that perforated his chest and heart.  Further, he opined that the wounds were consistent with a single-blade knife.  During his testimony, Dr. Pierre-Louis referred to a series of photographs, marked as Exhibits S-6, S-8, S-9, and S-10.[4]  The first three were of Martin's

---

[4] It appears that the photographs were marked for identification while Dr. Pierre-Louis was testifying, but were not published to the jury.

body on the autopsy table, each displaying the stab wound from different a distance.  The fourth was a photograph of Martin's heart after it was removed from his body, held in a hand with a pair of tweezers positioned through the bottom of it as a placeholder for the location of the stab wounds.  After this testimony, the trial court heard argument about which photographs would be admitted into evidence.  Of Exhibits S-6, S-8, and S-9 (the photographs of Martin's body on the autopsy table), defense counsel did not object to any one particular photograph being admitted, but objected to all three as "duplicitous."[5]  As to Exhibit S-10 (the photograph of Martin's heart), counsel objected to its admission as unduly inflammatory.

The trial court described Exhibit S-6 as a "view of the body . . . lying on the autopsy table," and that "[t]here is blood on the chest, but it's difficult to see the actual wound, it only shows where the wounds are and the decedent."  3T:24-18-22.  Describing Exhibits S-8, the court stated that it depicted "a closer view, showing the face of the [decedent] and the two wounds with . . . what appears to be a ruler down the chest, demonstrate[ing] the distance apart . . . ."  3T:24:23-25:1.  Then, describing Exhibit S-9, the court stated that the photograph showed an even "further closer view [that] would indicate and support the testimony of the medical examiner that the knife in question was sharp on one edge and blunt on the other," and on that basis admitted all three exhibits into evidence.  3T:25:1-5.  Agreeing with defense counsel, however, the court suppressed Exhibit S-10 as unduly inflammatory and without testimonial foundation.

The State also called Tonia Smith, a security guard working in the area on October 18, 1990; Police Officer Michael Daniluk, one of the officers who responded to the crime scene; and

---

[5]  In fact, Kates's attorney suggested that only Exhibits S-8 and S-9 were duplicitous, and proposed admitting Exhibits S-6 and S-9 (or S-6 and S-8), but not Exhibits S-8 and S-9 together.

Detective Edward Aimutis, the officer who investigated Martin's homicide. Smith testified that she saw a woman take a man behind the fish market, and five or ten minutes later saw them exit. She testified that she saw two other men in the area that night: a heavy, bowlegged man and another thin man. She was unable to identify any of the people whom she had seen. Officer Daniluk testified that it was Melvin who flagged him down to alert him to the stabbing. Detective Aimutis testified that in the course of his investigation of the crime scene, he found blood trails extending in a staggered manner in the nearby vicinity; blood spots in the alley where Martin's body had lain; and a crumpled dollar bill on the ground in the area with blue denim fibers attached to it. He testified that the dead man's clothing (which had been moved into evidence) included blue denim jeans.

Kates's defense advanced two theories in support of his innocence—first, that Caldwell, Coley, and Melvin were close friends and had conspired to "pin" the homicide on him as a newcomer to the group; and second, that he had an alibi. His alibi witness was Leroy Handy, who testified that he had been with Kates the day of the homicide; that he and Kates had traveled from Irvington into New York City to purchase narcotics; and that they returned to the hotel in Elizabeth at approximately 8:00 p.m. and remained in the room until midnight, when they left to purchase beer.

On the last day of the trial, one juror asked a court attendant "if the defendant came from a certain area." 3T:3:2-4. The trial court inquired of her why she had asked the question, and she responded that it had simply been out of curiosity. 3T:5:21-25. However, the juror then stated that she lived "right around the corner" from where Martin's homicide had occurred and that she believed this fact would interfere with her impartiality. The court dismissed her for

cause without objection from any party.  3T:6:1-8:17.  Immediately before doing so, the trial court asked the juror whether she had said anything to the other jurors about her familiarity with the area, and the juror responded that she had not.  3T:6:16-18.

During their deliberations, the jurors requested the court to re-charge on (as is relevant here) the law of robbery.  The jury thereafter convicted Kates on all six counts and Coley and Melvin on the first three counts (i.e., conspiracy, robbery, and felony murder).[6]  On July 3, 1991, the trial court sentenced Kates to life imprisonment with a thirty-year mandatory parole disqualifier.  Kates timely appealed his conviction, which the Appellate Division affirmed in an unpublished opinion on July 29, 1993.  *State v. Kates*, No. A-6328-90T4 (N.J. App. Div., July 29, 1993) (per curiam).[7]  The New Jersey Supreme Court denied certification for review on November 4, 1993.  *State v. Kates*, 134 N.J. 566 (1993) (table).  Kates did not file a petition for a *writ of certiorari* in the United States Supreme Court.  Thereafter, Kates, through counsel, sought post-conviction relief in the trial court, which denied the petition on the record on February 27, 1998.  7T:31:14-15. In a six-page opinion, the Appellate Division affirmed the order denying post-conviction relief on October 15, 1999 "essentially for the same reasons expressed" by the

---

[6] The jury found Kates not guilty of purposeful or knowing murder, but convicted him of the lesser included offense of aggravated manslaughter on that count.  The trial court entered a judgment of acquittal as to Coley on Count 4 as well.  The trial court merged all substantive counts entered against Kates into the felony murder conviction.  Thus, the charge for purposeful or knowing murder is not directly pertinent here.

[7] The Appellate Division reversed the convictions of Coley and Melvin based on the trial court's erroneous accomplice liability charge.  *See State v. Melvin*, No. A-378-91T4, at *12-16 (N.J. App. Div. Dec. 16, 1993).  The panel found that the trial court had failed to instruct the jury that to find Coley and Melvin guilty as accomplices to Kates's first degree robbery of Martin, it had to have found that they shared with Kates the *purpose* to use a knife in the robbery.  As a result, the court found that the erroneous jury charge vitiated the jury's ability to correctly consider the issue of felony murder given the affirmative defense that Coley and Melvin had no reasonable ground to believe Kates was armed.  *See id.*

trial court.  *State v. Kates*, No. A-4237-97T1, at *6 (N.J. App. Div. Oct. 15, 1999).  The New

Jersey Supreme Court denied certification on February 10, 2000, *States v. Kates*, 163 N.J.

75 (2000), and this timely petition followed on June 5, 2000.[8]

## II.

### A.

Kates asserts twelve grounds upon which he claims he is entitled to relief:

A.  "The trial court erred when it ruled during the *Phelps* [evidentiary] hearing that hearsay statements were admissible [as statements made by a co-conspirator during and in furtherance of a conspiracy], because there was no independent evidence of the conspiracy and defendant's relationship to it."  (Pet. at 1.[9])

B.  The trial court should have ordered a separate trial for defendant since his right to a fair trial was prejudiced by the admission of hearsay statements of co-defendants implicating defendant." (*Id.* at 2.)

C.  "The trial court's failure to properly instruct the jury denied the defendant his right to a fair trial." (*Id.* at 3.)

E.  "The trial court improperly allowed the prosecution to use a co-defendant's statement at trial after it had agreed that no statement would be used at trial." (*Id.* at 5.)[10]

F.  "The joint trial which resulted from the denial of defendant's pretrial and trial motions for severance impermissibly shifted the burden of proof, and violated defendant's right to have his

---

[8] Jurisdiction lies in this Court under 28 U.S.C. §§ 1331 and 2254.  On July 29, 2009, the Court received a letter from Kates dated June 26, 2009, in which he requested that counsel be appointed to assist with his petition, which the Court denied.  The Court then delivered its decision on the record on August 27, 2009, with Kates participating via video conference, and stated that this formal Opinion would follow.

[9] The substance of Kates's petition appears in an Addendum to Question # 12 on the form petition he filed.  For simplicity's sake, the Court cites only "Pet." herein.

[10] Kates did not assert a Claim D in his petition.

guilt proven beyond a reasonable doubt by the State." (*Id.* at 7.)

G. "The prosecutor's Opening Statement about the defendant's [sic] was highly inflammatory and unsupported by the evidence, and such remarks were clearly prejudicial and denied defendant a fair and just trial." (*Id.* at 8.)

H. "The gross misleading and gruesomely horrific color photographs of the victim denied defendant a fair and just trial." (*Id.* at 11.)

I. The State failed to present sufficient evidence to support a conviction for the crime of felony murder. Therefore, the conviction for felony murder must be reversed. . . . The State failed to establish that a homicide was committed in the course of a robbery." (*Id.* at 13.)

J. "When the evidence presented by the State is insufficient to establish all of the elements of the charged offenses then those charges must be dismissed." (*Id.* at 14.)

K. "The jury instructions on accomplice liability were erroneous and denied defendant his federal and state constitutional rights to a fair trial." (*Id.*)

L. "Defendant was denied the effective assistance of trial and appellate counsel in violation of his right to counsel under the State and United States Constitutions." (*Id.* at 24.)

M. "The cumulative effect of all the errors below mandates a reversal in this case." (*Id.* at 26.)

B.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), codified in relevant part at 28 U.S.C. §§ 2244 and 2254, states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

9

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[11]  Under the statute, only considerable errors of law warrant relief, for "habeas corpus is generally available only to protect against a fundamental miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *United States v. DeLuca*, 889 F.2d 503, 506 (3d Cir. 1989), *cert. denied*, 496 U.S. 939 (1990) (citing *Hill v. United States*, 368 U.S. 424, 428, *reh'g denied*, 369 U.S. 808 (1962)).  As Kates's claims were denied on the merits in the state courts, this Court must first "inquire whether the state court decision was 'contrary to' clearly established federal law, as determined by the Supreme Court of the United States; second, if it was not, the . . . [C]ourt must evaluate whether the state court judgment rests upon an objectively unreasonable application of clearly established Supreme Court jurisprudence." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 880 (3d Cir. 1999). A decision is not "contrary to" a Supreme Court decision if a petitioner's "interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Id.* at 888; *see also McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009) (citing *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) ("A state court decision . . . fails the 'contrary to' prong of [the] AEDPA if the

---

[11] Although the AEDPA was enacted in 1996 (after Kates's conviction had become final), it applies equally to his petition for habeas corpus, which he filed after the statute's enactment. *See Marshall v. Hendricks*, 307 F.3d 36, 50 (3d Cir. 2002).

10

state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question

of law or decides the case differently where the Supreme Court was confronted by a set of

materially indistinguishable facts."). A state court judgment is "objectively unreasonable" if it

"resulted in an outcome that cannot reasonably be justified under existing Supreme Court

precedent." *Id.* at 890. The 'clearly established' language 'refers to the holdings, as opposed to

the dicta, of [the] United States Supreme Court's decisions as of the time of the relevant state-

court decision.'" *McMullen*, 562 F.3d at 236 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71

(2003) (in turn quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))).[12]

## III.

As stated, Kates challenges the validity of his sentence on twelve grounds. Reading the

*pro se* petition liberally, as the Court must, *see Royce v. Hahn*, 151 F.3d 116, 118 (3d Cir. 1998),

Kates's claims can be divided into six general categories: (1) inadmissibility of hearsay evidence

and related hearsay issues; (2) other unduly prejudicial evidence; (3) erroneous jury instructions;

(4) insufficient evidence for conviction; (5) ineffective assistance of counsel; and (6) cumulative

effect of errors.

---

[12] Additionally, collateral relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(1). Exhaustion is accomplished when a petitioner "presents" in the state courts substantially the same claim he asks the federal courts to review. *See Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). Following a review of the state court records, the Court is satisfied that Kates has exhausted the available state court remedies for the twelve claims upon which he argues this Court may grant collateral relief. The Appellate Division deemed these claims to be devoid of merit on direct review, *see State v. Kates*, No. A-6328-90T4 (N.J. App. Div. July 29, 1993), and he presented essentially these claims collaterally in state court as well. To any extent that Kates has not exhausted a particular claim, this Court will review it on the merits nonetheless, as a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. *See* 28 U.S.C. § 2254(b)(2); *Lambert v. Blackwell*, 387 F.3d 210, 260 n.42 (3d Cir. 2004) Further, his federal collateral attack is timely, having been filed within one year of his state petition having become final. 28 U.S.C. § 2244(d)(2).

A.

Kates presents four related claims regarding the admissibility of hearsay evidence, couching them in terms of state evidentiary law.  But "errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial."  *Bisaccia v. Attorney Gen. of N.J.*, 623 F.2d 307, 312 (3d Cir. 1980) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 642-43 (1974)), *cert. denied,* 499 U.S. 1042 (1980); *see also Kontakis v. Beyer,* 19 F.3d 110, 120 (3d Cir.) (reaffirming that for "the admission of evidence in a state criminal proceeding to rise to the level of constitutional error, the petitioner must show 'fundamental unfairness' in violation of due process'") (quoting *Lisenba v. California,* 314 U.S. 219, 236 (1941)), *cert. denied*, 115 S. Ct. 215 (1994)).  To the extent Kates "argues that the state court violated the New Jersey evidentiary law as determined by the New Jersey Supreme Court in *State v. Phelps,* 96 N.J. 500 (1984)" and other cases, this Court is only concerned with "whether the admission of this testimony violated the 'Constitution or laws or treaties of the United States.'"  *Lambert v. Arvonio*, No. 93-4127, 1995 U.S. Dist. LEXIS 13090, at *20-21 (D.N.J. Sept. 5, 1995) (Wolin, J.) (citing 28 U.S.C. § 2254(a)).  Thus, it analyzes Kates's hearsay claims under federal, not state, law.  *See id.* at 21.

As the Court described earlier, both Caldwell and Coley testified as to certain out-of-court statements that Melvin and Coley made in the car and hotel room after the stabbing.  Specifically, Caldwell testified as to the following out-of-court statements:   (1) Melvin's statements to Kates in the car that he "didn't have to stab the man," and "[w]hy did you stab him?"; (2) Melvin and Coley's nearly identical statements to Kates in the hotel room; and (3) Kates's repeated responses to "shut up" and to "shut the f*ck up."  Coley also testified with

respect to Melvin and Kates's out-of-court statements made in the car on the way to the hotel.  It is these statements that Kates challenged on direct and collateral review in the state courts, and upon which he now urges this Court to set aside his conviction.[13]

1.

Kates argues in Claim A that the trial court erred by admitting Melvin and Coley's hearsay statements made in the car and hotel into evidence. Rule 801(d)(2)(E) provides in relevant part that "a statement is not hearsay if . . . [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); *see also Bourjaily v. United States*, 483 U.S. 171, 173 (1987).  In *Bourjaily*, the Supreme Court held that "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." 483 U.S. at 181.  The Court reserved on the issue of whether trial courts may rely solely upon the hearsay statement sought to be admitted in determining whether a conspiracy existed and whether the statement was made during the course and in furtherance of it. *Id.*  In 1997, Congress amended the rule—after Kates's direct appeal had been exhausted—adding that "[t]he contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the

---

[13] Statements falling within Rule 801(d) of the Federal Rules of Evidence are specifically defined as "not hearsay."  Fed. R. Evid. 801(d).  Nevertheless, the record demonstrates that the parties and the state courts referred to Melvin and Coley's out-of-court statements as "hearsay."  For continuity and clarity, the Court continues this practice; that is, it refers to the statements colloquially as "hearsay" statements that would otherwise fit the definition of the term absent Rule 801(d).

13

statement is offered under subdivision (E).  Fed. R. Evid. 801(d)(2).  Even assuming the amended version of Rule 801(d)(2) applies here,[14] Kates is not entitled to relief.

In order for an out-of-court statement by a co-conspirator to be admissible, a court must find by a preponderance of evidence that:  (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy.  *United States v. McGlory*, 968 F.2d 309, 333 (3d Cir. 1992) (citing Bourjaily, 483 U.S. at 175)).  As respondents correctly indicate, the predicate proof does not have to be overwhelming, but need only meet a preponderance threshold:  The standard "simply requires the prosecution to present sufficient proof leading the trial judge to find 'that the existence of the contested fact is more probable than its nonexistence.'"  *United States v. Ammar*, 714 F.2d 238, 250 (3d Cir. 1983) (quoting *United States v. Trotter*, 529 F.2d 806, 812 n.8 (3d Cir. 1976)), *cert. denied sub nom.*, *Stillman v. United States,* 464 U.S. 936 (1983); *see also McGlory*, 968 F.3d at 333-34.

Kates argues that during the *Phelps* hearing "there was no evidence independent of the hearsay of the existence of the conspiracy and [petitioner's] relationship to it.  Pet. at 1.  He

---

[14] Because the Supreme Court in *Bourjaily* specifically reserved on the question of whether a court must find independent evidence of a conspiracy, Rule 801(d)(2)(E) jurisprudence at the time Kates's direct appeal became final was not clear.  At the time of Kates's conviction, New Jersey law required independent evidence of a conspiracy, *see State v. Hunt*, 115 N.J. 330, 367 (1989), but neither the Supreme Court nor the Third Circuit had answered the question as a matter of then-current federal law.  *See Bourjaily*, 483 U.S. at 181; *United States v. McGlory*, 968 F.2d 309, 334 n.16 (3d Cir. 1992); *cf. Glasser v. United States*, 315 U.S. 60, 74-75 (1942) (before enactment of the Federal Rules of Evidence in 1975, requiring evidence of conspiracy independent of hearsay statement to be admitted).  This Court assumes *arguendo* (as the parties appear to have done), that independent evidence of a conspiracy was necessary to admit the co-conspirator statements at the time of Kates's conviction.  Even granting Kates this benefit of the doubt, however, does not change the outcome.

argues further that the statements were made "after the alleged conspiracy to commit robbery [had] ended," and thus were inadmissible under the rule. *Id.*   On direct appeal, the Appellate Division found that there was substantial independent evidence of a conspiracy, and that Melvin and Coley's statements were made during and in furtherance of that conspiracy:

> [Kates] and Melvin served as "lookouts" for Coley [on the night in question] while she engaged in prostitution.  Moreover, [Kates's] questioning of Coley after she had returned from behind the fish market regarding whether Martin "had any money" constituted a substantial step in furtherance of their plan to rob Martin which, in fact, came to pass.  Therefore, it is clear that [independent evidence of a conspiracy was admitted].
>
> As to the statement made in the automobile in which [Kates], Melvin[,] and Coley fled the scene, we are equally satisfied that the [statement satisfied the "in furtherance" and "during the course of" prongs].  A conspiracy is presumed to continue as to each member of it until [the] object of the conspiracy has been established [or] there is proof of an affirmative act of withdrawal as to one or more of the members thereof. . . .  Here the statements made in the automobile by Melvin were made before the division of the proceeds of the robbery and while [Kates], Melvin[,] and Coley were in the process of fleeing the scene of the crime and determining what further action was required to avoid apprehension.
>
> Likewise, the statement made in the hotel, although a closer question, also passes muster.  The murder weapon was in the hotel room with the perpetrators of the robbery where Coley saw it on a dresser.  The challenged statement about the killing took place at that time.  Again [Kates], Melvin[,] and Coley were still in the process of tying up the loose ends of their crime and attempting to suppress the evidence of it at the time the challenged statement was made.  As such, the trial judge correctly ruled that both statements were made during and in furtherance of a conspiracy.  Further, even if the statement in the hotel was not properly admitted, it can have constituted nothing more than harmless error in light of the fact that it came on the heels of the nearly identical accusation in the car[,] which was plainly admissible.

*State v. Kates*, No. A-6328-90T4, slip. op. at *9-11 (N.J. App. Div., July 29, 1993) (per curiam) (internal citations omitted).

This analysis is neither contrary to nor an unreasonable application of clearly established federal law. The evidence cited by the Appellate Division easily establishes by a preponderance of evidence the existence of an agreement among Coley, Melvin, and Kates to rob Martin. The hearsay statements themselves also support a finding of an agreement to commit robbery. On the evidence presented—that Kates was acting as a "lookout" for Coley, that he thereafter queried whether Martin "had any money on him," and that in the car he ordered Coley to "split up" the robbery proceeds—the trial court reasonably determined, for purposes of applying the co-conspirator exception to the hearsay rule, that a conspiracy had been formed.

Furthermore, the state courts did not unreasonably err in finding that the hearsay statements made in the car were made during the course of and in furtherance of the conspiracy. The criminal agreement to rob Martin was still going on when Kates divvyed up the robbery proceeds, which happened after the hearsay statements were made and during the getaway. And the statements need not have "*actually* facilitate[d]" the conspiracy, so long as they were generally "'intended to promote the conspiratorial objectives.'" *United States v. Weaver*, 507 F.3d 178, 184 (3d Cir. 2007) (quoting *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986) (emphasis in *Weaver*). The state courts found that the statements made in the car were made in an effort to conceal the conspiracy and determine the group's next course of action. This factual finding—that the statements were made during a heated exchange that served both to alert Coley

(the other member of the conspiracy) about the seriousness of the criminal enterprise and to help formulate a getaway plan—was not unreasonable.[15]

Kates also challenges the admission of the statements made in the hotel room—which essentially repeat the conversation in the car—on the basis that they were made after the conspiracy had concluded.   "A conspiracy is presumed to continue until its objective is achieved."   *Ammar*, 714 F.2d at 253 (citing United *States v. Corallo*, 413 F.3d 1306 (2d Cir. 1969), *cert. denied*, 396 U.S. 958 (1969)).   Assuming that the conspiracy's object was only robbery, in the course of which the victim was murdered, the hearsay statements made in the presence of the murder weapon, advanced the goal of avoiding detection and hiding the trio's guilt.   Even were this Court to disagree that the conspiracy was still ongoing in the hotel room, given the immediate temporal proximity of the crime and the getaway, the Appellate Division's factual conclusion otherwise was certainly not *unreasonable*.   Its conclusion is therefore entitled to deference.   The state courts did not contravene clearly established federal law, and as a consequence, Claim A fails.

---

[15] In any event, Kates does not take issue with the state-court determination that, assuming a conspiracy existed, the statements were made in furtherance of the conspiracy and that Coley and Melvin were members of it.   He challenges only the existence of the conspiracy itself and the timing of the statements (i.e., that they were not made during the course of the conspiracy, assuming one existed).   *See generally* Pet. at 1-3, 5-8.   Thus, Kates has waived the issue as to the "in furtherance" requirement.   *See Weaver*, 507 F.3d at 181 & n.5.

2.

Kates next asserts that the introduction of Melvin and Coley's out-of-court statements entitled him to a trial separate from Melvin and Coley.

(a)

Kates argues in Claim B that the Sixth Amendment and *Bruton v. United States*, 391 U.S. 123 (1968) required his trial to be severed from Melvin and Coley's based on the same hearsay statements that implicated him in the stabbing. The Appellate Division specifically held that *Bruton* did not apply because the statements were admissible as a statement made by a co-conspirator. Because this conclusion was a correct statement of federal law and was not unreasonably applied, Kates's claim fails.

In *Bruton*, the Supreme Court held that the Sixth Amendment requires separate trials of two co-defendants where an out-of-court inculpatory statement of one non-testifying co-defendant also inculpates the other. *See Bruton*, 391 U.S. at 123-26, 136-37. But *Bruton*'s holding is sharply circumscribed to a statement that was otherwise inadmissible under the rules of evidence:

> We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was . . . admissible against the declarant. . . . There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.

*Id.* at 129 n.3 (internal citations omitted).

Where such a statement is admissible under the rules of evidence, however—as is the case for statements made by co-conspirators in furtherance of a conspiracy—*Bruton* does not

18

apply.  *See, e.g.*, *United States v. Ward*, 793 F.2d 551, 556 (3d Cir. 1986); *United States v. Carson*, 455 F.3d 336, 365 (D.C. Cir. 2006) ("Statements satisfying the coconspirator non-hearsay rule under Federal Rule of Evidence 801(d)(2)(E) may be admitted against co-defendants without violating the Confrontation Clause."); *United States v. Shores*, 33 F.3d 438, 442 (4th Cir. 1994) ("We have held . . . that the *Bruton* rule does not apply if the non-testifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule set forth in Federal Rule of Evidence 801(d)(2)(E)); *United States v. Saks*, 964 F.2d 1514, 1525-26 (5th Cir. 1992); *United States v. Coco*, 926 F.2d 759, 761 (8th Cir. 1991) (We have explicitly held that *Bruton* is not violated where the hearsay statement is otherwise admissible under Rule 801(d)(2)(E) . . . .  The Confrontation Clause is satisfied when the out-of-court statement in question comes within a firmly rooted hearsay exception."); *United States v. McCown*, 711 F.2d 1441, 1448-49 (9th Cir. 1983); *United States v. Cox*, 449 F.2d 679, 688-89 (10th Cir. 1971); *see also Harris v. Moore*, No. 03-5847, 2005 U.S. Dist. LEXIS 29265, at *21 n.4 (D.N.J. Nov. 22, 2005) (Linares, J.) (in § 2254 petition, rejecting assertion that *Bruton* applies to statements otherwise admissible as under co-conspirator exception).[16]   On this authority in these circumstances, the Sixth Amendment did not entitle Kates to a trial separate from Coley and Melvin under *Bruton*.  Claim B therefore fails.

---

[16] Nor is *Crawford v. Washington*, 541 U.S. 36 (2004) implicated here.  *Crawford* proscribes the use of out-of-court *testimonial* statements unless the witnesses testifying to the declarant's statements are unavailable and the defendant has had a prior opportunity for cross-examination. 541 U.S. at 68.   It does not preclude admission of *non-testimonial* statements, which the statements made during the course and in furtherance of the conspiracy inarguably were here. *See id.*  ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."); *United States v. Hendricks*, 395 F.3d 173, 181 (3d Cir. 2005) (citing *United States v. Robinson*, 367 F.3d 278, 292 n.20 (5th Cir. 2004) ("The statement challenged as hearsay was made during the course of the conspiracy and is non-testimonial in nature.")).

(b)

Kates argues in Claim F that, irrespective of any *Bruton* issues, his conviction should be overturned because the joint trial impermissibly shifted the burden of proof to him on the basis of his co-defendants' supposed mutually antagonistic defenses. Pet. at 7-8. The state courts did not specifically address this argument either on direct appeal or post-conviction review.

Addressing it now, as a matter of federal law, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *United States v. Zafiro*, 506 U.S. 534, 540 (1993) (citing *United States* v. *Martinez*, 922 F.2d 914, 922 (1st Cir. 1991); *United States* v. *Manner*, 887 F.2d 317, 324 (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1062 (1990)). Moreover, "'there is a preference in the federal system for joint trials of defendants who are indicted together,'" and a trial court is vested with broad discretion to decide a motion to sever. *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996), *cert. denied*, 519 U.S. 1047 (1996) (citing *Zafiro*, 506 U.S. at 537). "Such joint trials promote efficiency in the courts and serve the interests of justice by preventing 'the scandal and inequity of inconsistent verdicts.'" *Id.* (quoting *Zafiro*, 506 U.S. at 537 (in turn quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987))). Consequently, only where "'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence,'" should a court grant a defendant's severance request. *Id.* (quoting *Zafiro*, 506 U.S. at 539). Such a risk may arise where co-defendants assert "mutually exclusive" defenses. *Id.* Even where such antagonistic defenses exist, however, severance is not mandatory absent prejudice. *Id.* (citing *Zafiro*, 506 U.S. at 538). "To obtain a reversal of [a] conviction for failure to sever where codefendants assert mutually antagonistic defenses, a

20

defendant 'must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial.'" *Id.* (quoting *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981)).

In *Voigt*, the Third Circuit described the contours of mutually exclusive defenses as follows:

> Although precise articulations may differ, courts agree that "mutually exclusive defenses . . . exist when acquittal of one codefendant would necessarily call for the conviction of the other." *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991). This type of situation arises "when one person's claim of innocence is predicated solely on the guilt of a co-defendant." *United States v. Harris*, 9 F.3d 493, 501 (6th Cir. 1993). In determining whether mutually antagonistic defenses exist such that severance may be required, the court must ascertain whether "the jury could reasonably construct a sequence of events that accommodates the essence of all appellants' defenses." *United States v. Perez-Garcia*, 904 F.2d 1534, 1548 (11th Cir. 1990).

> While mutually antagonistic defenses have been much discussed in theory, only rarely have courts found that they exist in practice. *See Zafiro*, 506 U.S. at 538; *see also Tootick*, 952 F.2d at 1078 (finding mutually antagonistic defenses warranting reversal where two defendants charged with assault both defended themselves by arguing that the other committed the assault alone). Far more frequently, courts have concluded that the asserted defenses, while in conflict with one another, are not so irreconcilable that "the jury could not have been able to assess the guilt or innocence of the defendants on an individual and independent basis." *Tootick*, 952 F.2d at 1083. . . .

> Moreover, courts have consistently held that finger-pointing and blame-shifting among coconspirators do not support a finding of mutually antagonistic defenses.

*Voigt*, 89 F.3d at 1094-95 (first alteration in original; parallel citations omitted); *see also United States v. Smith*, 44 F.3d 1259, 1266-67 (4th Cir. 1995) (affirming denial of motion to sever where defendant's co-defendants claimed that he ran the entire scheme and that they were just victims of his criminal influence), *cert. denied*, 115 S. Ct. 1970 (1995); *United States v. Linn*, 31

21

F.3d 987, 992 (10th Cir. 1994) (affirming denial of motion to sever where each co-conspirator defended himself by blaming the others on the ground that the jury could have believed all defendants' theories and acquitted them all); *United States v. Rivera*, 6 F.3d 431, 438 (7th Cir. 1993) (affirming denial of motion to sever where co-defendants in a drug conspiracy all claimed ignorance and blamed each other on ground that "plain and simple blame-shifting" does not necessarily prevent jury from making reliable judgment about guilt or innocence), *cert. denied*, 510 U.S. 1130 (1994); *United States v. Barber*, 442 F.2d 517, 530 (3d Cir. 1970) (holding that "the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another" are insufficient grounds to require severance), *cert. denied*, 404 U.S. 958 (1971).

Kates does not specify how his legal defense irreconcilably contrasted with Coley's and Melvin's.  His defense was that he was not at the scene of the crime, and so he neither committed the robbery nor conspired with Coley and Melvin.  And Kates's co-defendants argued both that they did not have the requisite intent to commit robbery and that they had not agreed with anyone to commit such a crime.  Thus, for instance, the jury could have acquitted Coley and Melvin of robbery and conspiracy for a lack of intent and the absence of an agreement (and therefore acquitted them of felony murder as well).  Such a conclusion did not inherently require the jury to disbelieve Kates's alibi theory.  Consequently, on the facts and defenses presented, the jury could have acquitted all three.  That it unanimously agreed not to do so did not render the trio's defenses mutually antagonistic:  As the Third Circuit stated in *Voigt*:  "Although it is fairly clear that these defenses [asserted by other co-defendants], by pointing the finger of blame at Voigt, increased the likelihood that Voight would be convicted, the Supreme Court has stated

that this type of injury alone does not mandate severance." *Voigt*, 89 F.3d at 1095-96 (citing *Zafiro*, 506 U.S. at 540).  Kates is in the same position:  The state courts did not contravene or unreasonably apply clearly established federal law when they rejected Kates's severance claim. Claim F therefore fails.

3.

Finally, Kates argues in Claim E that because the State initially agreed not to use Melvin and Coley's out-of-court statements at trial, the eventual use of such statements rendered his conviction constitutionally defective.  He is incorrect.  First, historically (as stated by the Appellate Division), Kates overemphasizes the government's "agreement" not to use the co-conspirator's statements at trial.  In an initial status hearing on May 6, 1991, the trial court asked the State whether it intended to use the hearsay statements at trial when it considered whether *Bruton* required severance.  The State indicated that it did not intend to use the hearsay statements.  It did not, as petitioner suggests, "agree" or "stipulate" never to use the statements, nor did the trial court in any way "rule" that the statements would be inadmissible for all time. Moreover, the trial court later held a *Phelps* hearing regarding the out-of-court statements, during which Kates had full opportunity to object to the State's apparent change of course.  This Court is aware of no federal constitutional rule of law that binds the government to an initial indication that it does not intend to utilize a particular piece of evidence at trial, especially when the later decision is communicated and a full-blown evidentiary hearing takes place.  As a result, the Appellate Division held, Kates was not deprived of due process.  Because this Court may not disturb this reasonable factual finding, Claim E does not warrant relief.

B.

The Court now turns to Kates's claims that the trial court improperly permitted certain evidence to be considered by the jury, and did not declare a mistrial based on prosecutorial misconduct.   Federal courts must afford the states broad deference in their determinations regarding issues of evidence and procedure.  *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). It is axiomatic that "a state court's misapplication of its own law does not generally raise a constitutional claim," and that "[f]ederal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  *Smith v. Horn*, 120 F.3d 400, 414 (3d Cir. 1997) (citations omitted), *cert. denied*, 522 U.S. 1109 (1998). Evidentiary rulings *may* violate due process, however, when a petitioner is deprived of fundamental fairness.  *See Lisenba v. California*, 314 U.S. 219, 228 (1941) (holding that state court's evidentiary rulings may form the basis for habeas relief when they "so infused the trial with unfairness as to deny due process of law"); *Kontakis v. Beyer*, 19 F.3d 110, 120 (3d Cir. 1994), *cert. denied*, 513 U.S. 881 (1994). The proper inquiry is whether the challenged admission of evidence constitutes "a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure."  *United States v. De Luca*, 889 F.2d 503, 506 (3d Cir. 1989) (citing *Hill v. United States*, 368 U.S. 424, 428, *reh'g denied*, 369 U.S. 808 (1962)).

Claims of prosecutorial misconduct during opening statements are similarly reviewed for egregious deprivations of fundamental fairness.   The Court must "consider 'whether [a] prosecutor[']s comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Fahy v. Horn*, 516 F.3d 169, 198 (3d Cir. 2008) (quoting *Darden v.*

24

*Wainwright*, 477 U.S. 168, 181 (1986) (other internal quotations omitted)).  "[T]he prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) (in turn quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))); *see also Fahy*, 516 F.3d at 198-99.  The Court must be mindful to "distinguish between ordinary trial error and that sort of egregious misconduct which amounts to a denial of constitutional due process."  *Fahy*, 516 F.3d at 199 (quoting *Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992) (in turn quoting *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 678 (3d Cir. 1976))).  It also must "examine th[e] remarks in the context of the whole trial," *Werts v. Vaughn*, 228 F.3d178, 198 (3d Cir. 2000) (citing Ramseur, 983 F.2d at 1239 (in turn citing *Greer*, 483 U.S. at 766)), which "must be sufficiently prejudicial in the context of the entire trial to violate a petitioner's due process rights.  *Id.* (citing *Greer*, 483 U.S. at 766 (in turn citing *Donnelly*, 416 U.S. at 639)).

Finally, even if this Court finds error in the state court's evidentiary or procedural determinations, it should not set aside the conviction if it "may confidently say on the whole record that the constitutional error was harmless beyond a reasonable doubt."  *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

1.

The prosecutor called Kates a "pimp" during his opening statement:

> Now the judge explained to you what the purpose of the indictment was.  It wasn't evidence of their guilt, but let me tell you the facts and circumstances which led to these people being indicted.  You see all three, Jackie Coley, Wallace Melvin, and Eddie Kates all know each other.  Jackie Coley was a prostitute, Wallace Melvin was one of her pimps, Eddie Kates is one of her pimps.  On the

particular night in question, October 18, 1990, they decided that they were going to rob somebody, and the best way they were going to do that was to have Jackie set upon one of her clients, one of her dates, and the three of them, by having Jackie Coley set up the dates, the other two would go and rob the date, the client. The plan was for Ms. Coley to find out which one of the people, which one of the men she was going to solicit that evening, to find out which one had money. After all, it wasn't so obvious who had money and who didn't, and that's what happened.

2T:71:12-72:6.

Kates argues in Claim G that the prosecutor's reference to him as a "pimp" during his opening statement "exceeded the bounds of propriety" because it "served to deny [him] his right to a fair trial, and [was] a clear denial of due process." Pet. at 10. He claims that the evidence adduced at trial did not prove in fact that he was a pimp, and that in any event the prosecutor's reference was "prejudicial, inflammatory, and in bad faith." *Id.* The Appellate Division found this claim to be "entirely lacking in merit," and neither the trial court nor the Appellate Division addressed the argument on post-conviction review; upon independent review of the record, this finding was not contrary to or an unreasonable application of federal law.[17]

---

[17] The State suggests that because Kates did not contemporaneously object to the prosecutor's use of the word "pimp," he is procedurally defaulted from arguing that claim here. State Answer at 29; *Cf. Wainwright* v. *Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1989). "[W]hen a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice." *Engle*, 456 U.S. at 129; *see also Taylor v. Horn*, 504 F.3d 416, 427 (2007) ("A habeas claim has been procedurally defaulted when 'a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.'") (quoting *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)). This rule applies equally to state procedural defaults based on a failure contemporaneously to object to a claimed trial error. *Id.* Moreover, federal courts "will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision. *Harris v. Reed*, 489 U.S. 255, 260 (1989) (citing *Fox Film Corp.* v. *Muller*, 296 U.S. 207, 210 (1935)). But "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state

Caldwell's testimony as to Kates's activity was as follows:

> Q.   Do you know what Eddie and Heavy were out on the street for that evening?
>
> A.   Watching Jackie [Coley].
>
> Q.   When you say watching Jackie, do you know what that means?  What do you mean by that?
>
> A.   Looking after her.
>
> Q.   In the event that what happens?
>
> A.   Just to protect her.
>
> Q.   Is that what they were doing on that particular evening?
>
> A.   That's why they always be out there.

2T:142:8-18.  Coley testified likewise on direct examination:

> Q.   Now were there any other people that were with you that evening?
>
> A.   Yes, [Martin], Heavy, and Eddie.
>
> Q.   What were they doing?
>
> A.   They always be out there with me just in case the young guys, whoever[,] give me a hard time, they would be there for me.
>
> Q.   When you say they would be there for you, what do you mean?

procedural bar." *Id.* at 263 (quoting *Caldwell* v. *Mississippi*, 472 U.S. 320, 327 (1985)).  The Appellate Division—the last state court to render a judgment on the issue—stated that the claim as to the prosecutor's pimp comment (among others) was "entirely lacking in merit." *State v. Kates*, No. A-6328-90T4, at *4 (N.J. App. Div., July 29, 1993) (per curiam).  Subsequently, the state post-conviction relief courts did not address any failure contemporaneously to object.  Because the state-courts did not refuse to consider the issue, and did not rest their disposition of the claim on a "clear and express" statement it rested on an independent and adequate *state*-law ground—but instead reached the issue and stated simply that the claim lacked merit—this Court may address the federal claim. *See Harris*, 489 U.S. at 263; *Coleman*, 501 U.S. at 734-35.

A.      Not let nobody hurt me.

3T:41:25-42:9.  On cross-examination, Coley testified similarly:

Q.      Now who watches out for you on the street?

A.      [Melvin] and Eddie.

· · ·

Q.      Do you know why Eddie and Kates—why Eddie and Wallace Melvin were out on the street?

A.      Do I know why they were out there for?

Q.      Yes.

· · ·

A.      When they do be out there, they be out there with me.

Q.      Doing what?

A.      Protecting me.

Q.      How do they protect you?

A.      For walk-up dates, stuff like that.

Q.      How do they do that?

A.      If anybody walks up to me and try to hurt me or anything, they be there to help.

Q.      How do they be there?  Tell me how they be there.

A.      Like you right there, standing there.

Q.      That's it?

A.      Yes.

Q.      They don't do anything?

A.      If they try to hurt me, they are going to do something.

28

Q.      Like what?

                        . . .

A.      Well, mainly they just stand there, really.

Q.      Now when you are soliciting, you don't really want any
        other males around, you don't want males –

A.      They don't stand right there.

Q.      How far away are they?

A.      Across the street.

                        . . .

Q.      So they can see what is going on in case you get into
        trouble?

A.      Yes.

3T:65:8-67:15.

"The purpose of an opening is to give the broad outlines of the case to enable the jury to comprehend it.   It is not to poison the jury's mind against the defendant."   *Gov't of V.I. v. Turner*, 409 F.2d 102 (3d Cir. 1969); *see also United States v. Somers*, 496 F.2d 723, 738 (3d Cir. 1974) (quoting *Turner*).   In *Turner,* the defendant was charged with having made two fraudulent credit card purchases totaling $800, but in its opening statement, the government prosecutor stated to the jury that the defendant had in fact made other charges for more than $4,000.  *Turner*, 409 F.2d at 103.  The Third Circuit found that such a statement as to fraudulent charges not in the case rendered the opening one that "was not what, in our opinion, an opening should be."   *Id.*   Nevertheless, the court found that the government's evidence against the defendant as to the charged conduct was "so overwhelming" that "an unfulfilled statement that

29

there was more" could not have made "any difference." *Id.* On the evidence introduced, the court held that because no jury could have failed to find the defendant guilty, the improper opening statement was rendered harmless. *Id.*

In *Somers*, the Assistant United States Attorney peppered his opening statement in a public corruption prosecution with such inflammatory phrases as: "brazen, contemptuous, and calculating perversion of the public trust"; "these conspirators operated in a league to systematically enforce their will to corruptly, venally extract tribute from those who sought to do business in Atlantic City"; "[t]heir greed could never be satiated"; "[t]hese defendants ruled Atlantic City, New Jersey as if it was their private kingdom"; and "[t]hey enforced a total feudal system of corruption upon that society and they acted as the lords of corruption." *Somers*, 496 F.2d at 737 n.26. "Categorically disapprov[ing]" of such colorful remarks during an opening statement, the Third Circuit stated that irrespective of "[w]hether or not proofs were ultimately adduced warranting such characterizations," they "add nothing to the legitimate education of the jury which is not afforded by the proper presentation of facts to be proved." *Id.* at 737-38. Nevertheless, the court found that in light of the trial court's instruction that the opening statement was not evidence and the relative length of the trial (three months), "whatever prejudicial effect there may have been was neutralized." *Id.* at 738

Here, the state prosecutor's reference to Kates as a "pimp" is palpably distinguishable. While the term is derogatory, it is also descriptive and well-supported by Coley and Caldwell's testimony, which does not shrink from the fact they were prostitutes soliciting customers, and which describes Melvin and Kates as standing nearby to protect them from "young guys" and "walk up dates" who might harm them. The word did not appear ubiquitously during the

opening statement (nor at all during the three-day trial), and did not poison or color the jury's ability to neutrally assess the evidence any more than the word "prostitute" did.  And it certainly did not render the entire trial *fundamentally unfair*.  *See James v. Bowersox*, 187 F.3d 866, 870 (8th Cir. 1999), *cert. denied*, 528 U.S. 1143 (2000) (holding that state prosecutor's reference to defendant as "a big time, drug dealing, murdering, robbing slime" did "not equate with the due process standard of a fundamentally unfair trial, which turns instead on whether the jury has the common sense ability to put aside a particular type of overzealous advocacy with the help of the court's standard instruction that arguments of counsel are not evidence."[18]).  To the contrary— the prosecutor's reference was highly consistent with the evidence later adduced.[19]  Finally, the solitary characterization of Kates as a pimp was neutralized by the rest of the evidence presented at trial, which did not turn on whether Kates did or did not fit the technical definition of the term "pimp," and which, as described *infra* in Section III.D, supported the jury's verdict.

"A criminal conviction is not to be lightly overturned  on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."

---

[18] It does not appear that the trial court instructed the jury that the opening statements were not evidence.  However, the irrelevance of whether Kates was or was not a "pimp" greatly diminishes any potential effect that use of the term might have had on the jury's verdict.

[19]As the State points out, Webster's Third New International Dictionary defines the word "pimp" as a "man who . . . lives off [a prostitute's] earnings and often solicits for her . . . ."   State Answer at 28.  The testimony supports an understanding that Kates and Melvin's activity fit the general definition of the term.  Moreover, the Court does not read the Third Circuit's statement in *Somers* that "[w]hether or not proofs were ultimately adduced warranting such characterizations is irrelevant" inexorably untethers every turn of the phrase during an opening statement from the relevant evidence later proffered to support it.  *Somers*, 496 F.2d at 737-38 (emphasis added).  Instead, the Court understands the proper inquiry to be measured on a continuum, factoring in the flagrancy of the term or terms used and the "fit" of the evidence that ultimately does or does not support it or them.

*U.S. v. Young*, 470 U.S. 1, 10 (1985).  Having reviewed the state prosecutor's reference to Kates as a "pimp" in context, the Court concludes that the single reference did not render the trial fundamentally unfair.  It was thus not constitutional error, and Claim G must therefore fail.

2.

Kates argues in Claim H that the trial court's admission into evidence of the autopsy photographs, Exhibits S-6, S-8, and S-9, so tainted the jury that the Constitution requires his conviction to be vacated.  Emphasizing that "the photographs were certainly not necessary because the manner of death was not disputed," he argues that "[t]he sympathy for the victim and the revulsion engendered by the photographs to which counsel objected were so prejudicial as to clearly create the often experienced trial phenomenon of losing the jury for the duration of the trial to fairly consider the factual evidence."  Pet. at 12.  The Appellate Division held on direct review that this claim was "entirely lacking in merit," a finding that did not contravene federal constitutional protections.

In *Gov't of V.I. v. Albert*, 241 F.3d 344 (3d Cir. 2001), a defendant convicted of felony murder—arising out of the gruesome stabbing death of a St. Croix-vacationer—appealed the trial court's admission of a graphic, 45-minute videotape of the murder scene.  *Albert*, 241 F.3d at 345-47.  The tape showed the nude victim's extensive stab wounds to the face, neck, arms, and legs, the blood-soaked sheets in which she lay, and at one point focused on her genitalia.  *Id.* at 349.  Reviewing the trial court's decision to admit the videotape under Fed. R. Evid. 403 for "arbitrar[iness] or irrational[ity]", *id.* at 347, the Third Circuit held that while it was indeed "gruesome," it was probative of the government's theory that multiple attackers were involved, and the manner in which they conducted themselves in the aftermath of the attack.  *Id.* at 349.

Turning to the defendant's argument that the tape was unnecessarily cumulative because photographic evidence of the scene was available for jury's consideration, the Third Circuit, assuming *arguendo* that the videotape's probative value was diminished because of the photographs, held that its admission was "harmless given the other evidence of [appellant's] guilt." *Id.*

A *fortiori* here—on collateral review for prejudicial errors of constitutional magnitude—the trial court found that each photograph displayed Martin's body from a different distance, demonstrating that each photograph had independent probative value that illustrated aspects of the case such as the manner of death and the state of mind of the perpetrator. The trial court described the first photograph, Exhibit S-6, as being difficult to see the actual wound. Exhibit S-8, the court stated, tended to show the distance between the two stab wounds, because the picture was a closer view of Martin's face and chest. Finally, Exhibit S-9 was taken from an even closer distance, and tended to demonstrate the nature of the murder weapon, which also corroborated the medical examiner's account that the knife was sharp on one side and dull on the other. Defense counsel did not object to the admission of any individual photograph, but only to their collective admission. It is difficult to see why admission of any particular photograph of Martin's body is constitutionally acceptable, but admission of the three photographs equates to "a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *De Luca*, 889 F.2d at 506. Significantly, the state court excluded Exhibit S-10—a photograph of Martin's extracted heart—as unduly inflammatory, demonstrating sensitivity to the potential prejudicial effect of graphic photographs. The trial court's admission of the photographs—and the Appellate

Division's finding that the admission comported with state evidentiary law and federal constitutional principles—warrants deference here.

Kates's assertions that the manner of death was undisputed and that the photographs were therefore "misleading, prejudicial, and not helpful to the jury on any issue" misses the mark. The manner of death was, as the State argues, probative of the perpetrator's state of mind. Pet. at 12. Kates was charged with purposeful and knowing murder in addition to felony murder, and thus considerations such as the number of stab wounds, the brutality with which Martin was stabbed, the direction in which he was stabbed, the size of the wounds, and the type of weapon used all could have factored into whether the stabbing was premeditated, intentional, and/or knowing.[20] "The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules . . . ." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983). For the above reasons, Claim H fails.

## C.

After instructing the jury as to the crime of robbery, the trial court gave an instruction on accomplice liability as follows:

> Now I will have more to say later about the State's theory of what is called accomplice liability, but I will advise you at this time that in order for a defendant to be held liable as an accomplice to first degree robbery, that defendant either knew – it must be proven the defendant either *knew or should have known* that one of his accomplices was armed with and intended to use or threaten the immediate use of a deadly weapon.

---

[20] Finally, even were the Court to accept the claim that the "only conceivable reason for placing [the photographs] in evidence was to inflame the jury against [the defendant]," *Ferrier v. Duckworth,* 902 F.2d 545, 548 (7th Cir.), *cert. denied,* 498 U.S. 988 (1990), Kates has not demonstrated with any likelihood that the jury verdict would have been altered absent admission of any of the photographs. *See infra* Section III.D. On the whole record, any error was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 681.

> In other words, a defendant may be found guilty of second degree robbery while a co-defendant may be found guilty of first degree robbery.  What elevates it from a second to a first degree is in this case the knife.
>
> If you find that the State has failed to prove that the accomplice was not aware that the actor who used the knife was either – when I say was not aware, either *knew or should have known* his accomplice had a knife and intended to use it during the commission of the robbery, and I will have more to say about this as I have indicated later on in the charge.  If you find that the State has not proven beyond a reasonable doubt each of the elements of the crime of robbery as I have defined the crime to you, then you should find the defendant not guilty, and if you find that the State has proven beyond a reasonable doubt that the defendant committed the crime of robbery as I have defined that to you, but you have a reasonable doubt as to whether the defendant was armed with or used or threatened the immediate use of a deadly weapon at the time of the commission of the robbery, then you would find the defendant guilty of second degree robbery.
>
> If you find beyond a reasonable doubt that the defendant committed the crime of robbery and was armed with a deadly weapon or used or threatened the immediate use of a deadly weapon during the commission of the robbery, then you would find the defendant guilty of first degree robbery.

4T:18:9-19:21 (emphasis added).  Then, after instructing the jury on felony murder and the affirmative defenses thereto, knowing and purposeful murder, and weapons offenses, the trial court returned to accomplice liability, and gave the jury a lengthy general charge not directly implicated here.

As indicated earlier, during deliberations the jury requested a re-charge on the law of robbery.  As Kates notes in his petition, the trial court re-charged the jury as follows, in relevant part:

> Let me commence my re-charge by indicating to you robbery is actually a crime of the second degree, so robbery, if it's a robbery

it's a crime of the second degree. What elevates it from first degree to second degree is the fact that a deadly weapon is used during the commission of the robbery.

I have indicated to you that *each of these defendants must be considered separately* and if you were to find that one defendant was armed with a deadly weapon and you were considering the other defendant as an accomplice under what I have charged you, you must make a determination that the State has proven that the accomplice either knew of should have known that the party who was actually committing the act was armed with and used a deadly weapon or threatened the immediate use of a deadly weapon, and I point that out at this point because it is possible if you were to find they were all acting together only one was armed and the other two didn't know about the armament.

It's possible to find one guilty of first degree murder, excuse me, first degree robbery, that is, using the weapon, and the others not first degree. In other words, the other ones may be guilty of second degree in that they may have threatened to put a person in fear or use some force not knowing that the other participant in the offense was armed with a deadly weapon.

So if you are satisfied they either knew or should have known the other party had a deadly weapon it would not be reduced or actually it would be elevated to first degree robbery. This is a determination you must make on all the facts as testified to.

4T:92:9-14; 95:21-96:22 (emphasis added).

After this re-charge, defense counsel objected because in referring to the principal in the robbery, the trial court had referred to "defendant" in the singular as opposed to the plural "defendants." 4T:103:19-104:5. In other words, counsel believed that the trial court improperly suggested to the jury that it was in fact one person who stabbed Martin, unduly implicating Kates. A colloquy between Kates's counsel and the trial court then followed:

Counsel:     You said [in the initial charge] one and one. In your re-charge you said one and two.

The Court:    You don't think that's in the case?

36

| | |
|---|---|
| Counsel: | I am asking. |
| The Court: | I am asking you.  You don't ask me. |
| Counsel: | It's possible, but now you are forcing it down their throats. |
| The Court: | I am not forcing anything down their throats. |
| Counsel: | You are presuming they are under the affirmative defense argument of co-defendants, that one did it and the other two didn't know, and that was the nature of your charge.  I would like it noted for the record. |

. . .

| | |
|---|---|
| Counsel: | I would ask you take into consideration the fact that you can say defendants.  I think it should be re-charged. |
| The Court: | I know I did.  I don't think it should be re-charged at all.  I think [as] this whole case has developed your client was the one with the knife, every bit of evidence except your client's alibi witness' testimony in this case is directed to that your client is the one who had the knife, and the other two [illegible] in there as accomplices, because he had the knife. . . .  Accomplice to the robbery, and all the testimony that's offered, even the State's witness and the defendant Coley testified they were surprised and that Mr. Melvin surprised when he found out that [K]ates did it, so how you can say it is not in the case, two may be guilty of second, one may be guilty of first, is beyond me. |
| Counsel: | It's in the case.  With all due respect, [Y]our Honor is not the trier of fact. |
| The Court: | You bet I am not. |
| Counsel: | Your Honor is the instructed in the law, so to interpose at this point or any juncture [Y]our Honor's feeling as to what is in the case is wrong. |

| The Court: | If I was going to tell the jury what is in the case they would have had the verdict about an hour ago. |
| Counsel: | You just did, with all due respect. |
| The Court: | I don't believe I did.  Your objection is noted. |

4T:104:18-106:15.

Kates challenges the trial court's instructions on two grounds.  First, he argues in Claim C that the trial judge "improperly injected his own conclusions as to the desired verdict during the re-charge."  Pet. at 4-5.  Second, he attacks in Claim K the substantive validity of the trial court's instructions on accomplice liability.  *Id.* at 14-24.

1.

Initially, insofar as Kates asserts that statements made by the judge during the colloquy between himself and trial counsel following the re-charge injected his own feelings about the case (i.e., "If I was going to tell the jury what is in the case they would have had the verdict about an hour ago"), such statements were made outside the presence of the jury and thus had no effect upon it.  To the extent he reiterates counsel's trial argument, *viz.*, that during the re-charge, the trial court improperly referred to a single principal (thus permitting the inference that there must have been one and only one principal), the Court likewise finds no error of constitutional dimension.

When reviewing a jury instruction on collateral review, the Court must only "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  *McGuire*, 502 U.S. at 72 (1991) (quoting *Boyde* v. *California*, 494 U.S. 370, 380 (1990)).  In other words, the relevant question is "whether the

ailing instruction by itself so infected the entire trial that the resulting conviction violated due process . . . , not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Martin v. Warden, Huntingdon State Corr. Inst.*, 653 F.2d 799, 809 (3d Cir. 1981) (alteration in original) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977), and *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).  Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *McGuire*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147); *see also Middleton v. McNeil*, 541 U.S. 433, 437 (2004).

The evidence presented at trial was entirely consistent with a single principal having committed the stabbing.  Thus, any inadvertent implication by the trial court to that effect was not prejudicial because juror confusion was never an issue.  In any event, viewing the initial jury instruction (which Kates's attorney favored) and the re-charged instruction together, any suggestive references by the trial court in the re-charge to a single principal actor were neutralized by the court's explicit and repeated direction to evaluate each co-defendant separately.  During the first charge, the trial court instructed as follows:

> Each offense and each defendant should be considered separately.
> The fact that you may find a particular defendant guilty or not
> guilty of a particular offense should not control your verdict as to
> the other offenses against that defendant or to the charges against
> the other defendant[s].

4T:14:12-17.  As quoted above, during the re-charge, the trial court reinforced this directive with the following:

> I have indicated to you that each of these defendants must be
> considered separately and if you were to find that one defendant
> was armed with a deadly weapon and you were considering the
> other defendant as an accomplice under what I have charged you,

39

> you must make a determination that the State has proven that the accomplice either knew or should have known that the party who was actually committing the act was armed with and used a deadly weapon or threatened the immediate use of a deadly weapon . . . .

4T:95:21-96:5. Additionally, other references made by the trial court, when taken in context, make clear that it was entirely for the jury to decide whether and how many of the defendants principally committed the robbery, whether and how many of the defendants were armed in doing so, and whether and how many complicit defendants knew that the principal or principals was or were armed:

> On the other hand, if you find beyond a reasonable doubt that the defendant committed the crime of robbery, that the defendant *or defendants* were armed with a deadly weapon, used or threatened the immediate use of a deadly weapon during the commission of the robbery, then of course you find *them* guilty of robbery in the first degree.

4T:97:10-16 (emphasis added).

"Even when an erroneous instruction is given, habeas corpus relief can be granted only if the error goes beyond ordinary trial error to egregious misconduct which is of constitutional magnitude. *Grecco v. O'Lone*, 661 F. Supp. 408, 413 (D.N.J. 1987 (Thompson, J.) (citing *Spratlin v. Solem*, 577 F.2d 56 (8th Cir. 1978); *United States ex rel. Perry v. Mulligan*, 544 F.2d 674 (3rd Cir. 1976), *cert. denied*, 430 U.S. 972 (1977)). Even assuming the trial court's re-charge improperly referenced a single principal, on the whole, this Court concludes that the manner in which the trial court re-charged the jury on the crime of robbery did not rise to the level of "so infect[ing] the entire trial that the resulting conviction violated due process." *Martin*, 653 F.2d at 809. It thus rejects Claim C.

2.

The Appellate Division ultimately reversed Coley and Melvin's convictions because the trial court erroneously charged the jury that to find those defendants guilty of first-degree robbery, it needed to find only that they *knew or should have known* that the principal had been armed with a knife, not that they shared the principal's criminal *purpose* to use the knife in the robbery.  As a result, the Appellate Division held, the erroneous instruction vitiated the jury's ability properly to evaluate the affirmative defense to felony murder provided by N.J.S.A. § 2C:11-3(a)(3).[21] Endeavoring to piggy-back on the reversals of Coley and Melvin's convictions, Kates argues that the trial court's erroneous instructions on accomplice liability stripped him of his constitutional right to a fair trial.  He contends that under *State v. Bielkiewicz*, 267 N.J. Super. 520, 533 (App. Div. 1993), and *State v. Harrington*, 310 N.J. Super. 272, 278 (App. Div. 1998), *certif. denied,* 156 N.J. 387 (1998), his conviction must be reversed.  Pet. at 21-24.  Those cases reversed purposeful or knowing murder convictions based on complicity theories because the trial courts' accomplice-liability instructions failed to instruct that even if the jury concluded that the principals committed purposeful or knowing murder, the accomplices could be found guilty of a lesser offense.  Kates argues here that because the Appellate Division reversed Coley and Melvin's convictions on the erroneous accomplice-liability charge, he too is entitled to relief.  On

---

[21]  The New Jersey criminal code provides an affirmative defense to felony murder for accomplices that play minor roles in the predicate offense.  To be eligible for the affirmative defense, the accomplice:  (1) must not have "commit[ted] the homicidal act or in any way solicit[ed], request[ed], command[ed], importune[ed], cause[ed] or aid[ed] the commission thereof"; (2) must not have been "armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons"; (3) must have "[h]ad no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance"; and (4) must have "[h]ad no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."  N.J.S.A. § 2C:11-3(a)(3).

direct appeal, however, the Appellate Division rejected this very claim as "entirely lacking in merit." *State v. Kates*, No. A-6328-90T4, at *4, and the trial court specifically rejected the claim upon post-conviction review, stating the following:

> It's abundantly clear that the basis for the reversal of the co-defendants' conviction bears no import on the outcome of [Kates's] trial. [Kates's] reliance on the Appellate Division's conclusion as to the effect of the accomplice-liability charge on co-defendants' rights to a fair trial is simply misplaced. The evidence presented at trial overwhelming[ly] supported the jury's finding that his defendant acted as the principal, and in this respect the reliance [o]n [*Bielkiewicz*] is misplaced.

7T:25:11-21.

"[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *McGuire*, 502 U.S. at 67-68; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)). Because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," *McGuire*, 502 U.S. at 67-68, the Court lacks subject-matter jurisdiction over this claim. *See Priester v. Vaughn*, 382 F.3d 394, 401-02 (3d Cir. 2004) (rejecting petitioner's ineffective assistance of counsel claim for failing to object to accomplice-liability instruction where state court had held that the charge complied with state law); *Nesmith v. Cathel*, No. 05-4069, 2007 U.S. Dist. LEXIS 56359, at *15-18 (D.N.J. Aug. 2, 2007) (Pisano, J.) (dismissing habeas claim for failure to give a *Bielevicz* instruction where state court had concluded as a matter of state law that petitioner was not entitled to an accomplice-liability charge.).[22]

---

[22] The Court notes that even if the lodestar for challenging the accomplice liability charge on habeas review were New Jersey law, this State's law squarely hold that "the obligation to provide the jury with instructions regarding accomplice liability arises only in situations where

Even if Kates had appropriately raised a constitutional claim, the Court finds that his prosecution comported with federal due process.  To the extent he argues that the erroneous charge as to Melvin and Coley "infected the [j]urors' deliberations with regard to his conviction" like that of his co-defendant[s]," in contravention of federal safeguards, Pet. at 18, again the Court must only "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *McGuire*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).  Here, the State's and petitioner's theories and supporting evidence implicated, in essence, a single issue:  Whether or not Kates acted as the principal by personally robbing and stabbing Martin.  The State argued that he did, while Kates asserted that he was not even present at the scene.  Under these theories, the trial court's accomplice-liability charge—erroneous or not—did not encroach upon the fundamental fairness of the trial *as to Kates*, because such a charge was inapposite to both sides' proffered factual and legal theories. Conceding that his legal defense was predicated on a total alibi, Kates argues that this "all or nothing defense [i.e., total denial of participation in the beating] was irrelevant," and that "[o]nce the jury rejected defendant's story as to non-complicity, as it obviously did, it was required to apply correct legal principles to assess the accused's liability under the State's own version of the events." Pet. at 19.  But Kates answers his own question:  Once the jury accepted the prosecution's witnesses' version of events, it necessarily determined that he was the principal actor in the stabbing.

---

the evidence will support a conviction based on the theory that a defendant acted as an accomplice." *State v. Crumb*, 307 N.J. Super. 204, 221 (App. Div. 1997) (citing *Bielevicz*, 267 N.J. Super. at 527).  As was the case in *Crumb*, the State's theory in this case was that Kates was the principal, and the defense's theory was that Kates was not involved in the crime at all.  *Cf. id.* at 221-22.  Accordingly, Kates was not entitled to a charge on accomplice liability in any event, and thus any error in the charge did not affect the validity of his conviction.

The Court also rejects as without merit Kates's repeated claims that the jurors "appeared confused by the instructions they were given," and that they were "hopelessly befuddled," as evidenced by their request to be re-charged on certain legal principles.   Pet. at 22-23. Significantly, the jurors demonstrated their awareness that complicity carries with it varying levels of culpability depending upon the accomplices' state of mind:   They convicted Kates of aggravated manslaughter, but acquitted Melvin[23] entirely on that charge.

Because the erroneous complicity instruction had no bearing on Kates's conviction, the Court finds that it did not and could not have affected his right to constitutional due process. Claim K therefore does not warrant a writ of habeas corpus.

### D.

In summary fashion, Kates asserts in Claims I and J that the evidence presented at trial was insufficient to establish each element of the charged offenses.   Pet. at 13-14.   Claiming vaguely that the State failed to establish that a homicide was committed during the course of a robbery, he argues that "[t]he events as presented by the State's witnesses discloses that at the time of the victim['s] death, defendant had no intention of committing a theft.   It was further presented that defendant was not even in town at the time of the victim's death."   *Id.* at 13.   As the state courts summarily held, these claims lack merit.

The Due Process Clause of the Fourteenth Amendment does, as Kates notes, require that evidence be presented against a criminal defendant sufficient to prove each element of the charged offenses beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *United States v. Soto*, 539 F.3d 191, 193-94 (3d Cir. 2008), *cert denied*, 129 S. Ct. 938 (2009)

---

[23] As the Court noted above, the trial court entered a judgment of acquittal in favor of Coley on Count 4 before deliberations began.

*United States v. Schoolcraft*, 879 F.2d 64, 69 (3d Cir. 1989), *cert. denied*, 493 U.S. 995 (1989). The standard of review to be applied on a sufficiency of evidence claim on direct review is "particularly deferential" in which petitioner carries a "heavy burden": An appellate court must "view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Soto*, 539 F.3d at 194 (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (internal quotations omitted)). The AEDPA requires this Court to utilize an even more deferential approach on collateral review: It must determine, viewing the evidence in the light most favorable to the State, whether it was objectively unreasonable for the state courts to determine that sufficient evidence had been presented to the jury to allow a guilty verdict on the charged offenses. *See, e.g.*, *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) ("[W]e emphasize . . . that we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses with which he was charged. Instead, we must determine whether the [state court] itself was unreasonable in *its* conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based upon the evidence introduced at trial.") (citing *Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009) (emphasis in original); *accord Vazquez v. Wilson*, 550 F.3d 270, 276 (3d Cir. 2008); *Kamienski v. Hendricks*, No. 06-4536, 2009 U.S. App. LEXIS 11456, at *19-22 (3d Cir. May 28, 2009).

The New Jersey Code defines felony murder as a homicide when an

> actor, acting either alone or with one or more other persons, is
> engaged in the commission of, or an attempt to commit, or flight

> after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping, carjacking, criminal escape or terrorism . . . and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants.

N.J.S.A. § 2C:11-3(a)(3).[24]   The New Jersey Code renders one guilty of robbery when, "in the course of committing a theft,[25] he:  (1) [i]nflicts bodily injury or uses force upon another; (2) [t]hreatens another with or purposely puts him in fear of immediate bodily injury; or (3) [c]ommits or threatens immediately to commit any crime of the first or second degree."  N.J.S.A. § 2C:15-1(a).  Thus, to support Kates's conviction for felony murder, the State must have proved that:  (1) Kates committed or participated in a robbery or robbery attempt; (2) during or immediately after the crime's commission, Martin's death resulted; and (3) such a result was the "probable consequence" of Kates's felonious conduct.  *See State v. Martin*, 119 N.J. 2, 19-34 (1990).  To sustain Kates's predicate robbery conviction, in turn, the State must have proved the following four elements:

> (1) theft or attempted theft; (2) intimidating or assaultive conduct consisting of (a) inflicting bodily injury upon another or (b) threatening another with or purposely putting him in fear of immediate bodily injury or (c) committing or threatening immediately to commit any crime of the first or second degree or (d) using force upon another person; (3) the intimidating or assaultive conduct must have occurred during the theft or attempted theft or in immediate flight after the theft or attempted theft; and (4) defendant must have acted purposely.

*State v. Farrad*, 164 N.J. 247, 257 (2000).

---

[24] Because the trial court merged all substantive offenses into the felony murder charge—for which the predicate felony was robbery—this Court discusses only those two charged offenses.

[25] Relevant here, one is guilty of theft when he "unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof."  N.J.S.A. § 2C:20-3(a).

The trial testimony of Caldwell (who was not charged) and co-defendant Coley supports a rational guilty verdict against Kates.  Each woman's testimony corroborated the other's with respect to Kates's presence at the fish market when Martin was stabbed on October 18, 1990. Kates, however, argues that "it was . . . presented that [he] was not even in town at the time of the victim's death."  Pet. at 13-14.  True enough, Leroy Handy's alibi testimony permitted the jury to find that Kates was absent when the robbery occurred, but insofar as that testimony is diametrically opposed to the women's version of events, the jury had to make a choice.  It was entirely within the jury's province to disregard Handy and credit Caldwell and Coley.

Both Caldwell and Coley testified further that in the car immediately after leaving the crime scene, Kates split up $200 or $250 among Melvin, Coley, and himself (Coley testified that $200 had been divided; Caldwell, who did not receive any of the proceeds, thought it had been $250).  3T:63:7-16; 2T:146:20-147:6.  Further, evidence was adduced at trial that:  (1) Kates—as he walked back toward Coley as she exited the alley immediately after terminating the sexual interlude—inquired how much money Martin had just given her and whether he "had any money"; and (2) Detective Aimutis found a crumpled dollar bill that appeared to have been inside Martin's blue jeans.  2T:131:13-132:9; 3T:43:9-44:15, 53:13-22.  This evidence easily supports a conclusion that Kates committed theft by stealing money from Martin.  Additionally, the evidence permits a reasonable conclusion that, having his mind on Martin's money, Kates had a premeditated purpose to rob Martin as he proceeded down the alley.

Melvin and Coley's statements in the car and hotel that Kates "didn't have to stab the man"—events that are consistent with the cause of Martin's death and Coley's testimony that she saw a knife on the hotel dresser—also permitted at least two coherent inferences.  3T:47:20-48:5.

47

First, it tends to show that Kates was in fact the one that stabbed Martin, demonstrating that Kates had inflicted bodily injury during the course of stealing Martin's money, and that Martin died as a result.  Second, the statements that Kates "didn't have to stab the man" and "you could have punched him or something," tend to imply that some other criminal motive, *i.e.*, robbery, had been contemplated originally, thus supporting the jury's conclusion that Kates acted with a criminal purpose.  Finally, given the temporal connection between the time Kates entered the alley and the time Melvin flagged down Officer Daniluk to alert him of the stabbing, a rational jury could conclude beyond a reasonable doubt that Martin's death had been caused during the course of the robbery.

The evidence upon which Kates's conviction rested—though almost exclusively testimonial—was internally consistent and made sense.  As such, the trial evidence constituted a reasonable basis for the state courts to conclude that the jury rendered a rational verdict when it found Kates guilty of robbery.  Given the nature of the robbery, in which the assaultive conduct (*i.e.*, stabbing) satisfying the second and third elements of the crime was the very cause of Martin's death, it necessarily follows that Martin's death occurred during the commission of the robbery.  It is also beyond doubt that death is a "probable consequence" of a knife-point robbery in an alley during the middle of the night.  *Cf. Martin*, 119 N.J. at 32 ("[I]n a robbery of a store in which the shopkeeper fires at the robber but instead kills an innocent bystander, the death would not be too remote for the defendant to be guilty of felony murder.") (internal citations and quotations omitted).

A "claim that the jury's verdict is against the weight of the evidence is 'essentially a matter of state law, and does not raise a federal constitutional question unless the record is

completely devoid of evidentiary support in violation of [p]etitioner's due process." *Alvarez v. Hauck*, No. 07-4383, 2008 U.S. Dist. LEXIS 31651, at *33 (D.N.J. Apr. 16, 2008) (Chesler, J.) (quoting *Douglas v. Hendricks,* 236 F. Supp. 2d 412, 435-36 (D.N.J. 2002)).   As the foregoing examination of the trial evidence establishes, there was evidentiary support for the verdict and the conclusions of the state court easily pass constitutional review under § 2254(d)(1), to wit:   It was not objectively unreasonable for the state courts to determine that a rational trier of fact could have found beyond a reasonable doubt that Kates caused Martin's death while committing a robbery.  Claims I and J therefore fail.

E.

Kates attacks in Claim L the adequacy of his trial and appellate counsel.  "In all criminal prosecutions, the accused shall enjoy the right to . . . the Assistance of Counsel for his defence." U.S. Const. amend. VI.  It is well settled that this "right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann* v. *Richardson*, 397 U.S. 759, 771, n.14 (1970)).  To succeed on a constitutional claim of ineffective assistance of counsel, Kates must satisfy the familiar two-part test set forth by the Supreme Court in *Strickland*.  First, he must show that attorney's performance was deficient in the sense that it fell below an objective standard of reasonableness.  Second, he must prove that he suffered prejudice as a result of his attorney's deficient performance.  *Id.* at 687-693.  As to the first prong:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney

49

> performance requires that every effort be made to eliminate the
> distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time. Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong
> presumption that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the defendant must
> overcome the presumption that, under the circumstances, the
> challenged action might be considered sound trial strategy. There
> are countless ways to provide effective assistance in any given
> case. Even the best criminal defense attorneys would not defend a
> particular client in the same way. . . .  Representation is an art, and
> an act or omission that is unprofessional in one case may be sound
> or even brilliant in another.

*Id.* at 689, 693; *see also Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir. 1987) ("Few petitioners will be able to pass through the 'eye of the needle' created by *Strickland*.") (internal citation omitted).  Second, to prove prejudice, Kates must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Finally, the Court need not address both prongs of the test, or if it does, in any particular order.  *See Rolan v. Vaughn*, 445 F.3d 671, 678 (3d Cir. 2006); *Boyd v. Warden, SCI Waymart*, No. 07-2185, 2009 U.S. App. LEXIS 17008, at *139-40 (3d Cir. July 31, 2009) (Hardiman, J., *concurring in part and dissenting in part*).

Kates lists in conclusory fashion the following six sub-claims in which he argues that counsel's ineffectiveness at trial and on direct appeal requires a writ of habeas corpus:

> (a) Trial counsel was ineffective in failing to consult adequately
> with defendant and in failing to interview the Alibi witness and
> preparing him for his testimony at trial and Appellate Counsel
> was ineffective in failing to raise this issue on direct appeal.

> (b) Trial counsel was ineffective in failing to cross-examine State
> witness Caldwell and co-defendant Coley about the impact of

50

their cocaine ingestion on their recall ability and in failing to present expert testimony regarding the impact of cocaine on the memory and appellate was ineffective in failing to raise this issue on direct appeal.

(c) Trial counsel was ineffective in failing to ascertain from the Prosecutor the existence of any informal deals or inducements to key State witness Caldwell to procure her testimony and in failing to cross-examine her about the existence [of] or her expectation of any such deals or inducements by law enforcement to her and Appellate counsel was ineffective in failing to raise this issue on direct appeal.

(d) Trial counsel's failure to request the appropriate charge regarding accomplice liability and Appellate counsel's failure to raise this issue on defendant's direct appeal comprised ineffective assistance of counsel.

(e) Trial counsel's failure to ask the trial court to question the jurors to ascertain if they had been tainted and Appellate counsel's failure to raise this issue on direct appeal denied defendant his Federal and State Constitutional Rights to the effective assistance of counsel.

(f) Counsel[']s derelictions impugned the overall fairness and reliability of the trial.

Pet. at 24-25.[26]

In its perfunctory opinion on Kates's appeal for state post-conviction relief, the Appellate Division affirmed "essentially for the reasons expressed by Judge [Thomas] Brown in his oral opinion of February 27, 1998." *State v. Kates*, No. A-4237-97T1, at *6 (N.J. App. Div. Oct. 15,

---

[26] Kates appears to have replicated portions of the brief submitted by counsel in support of his appeal from the trial court's denial of state post-conviction relief. Reading his petition liberally and to the extent feasible, the Court addresses the arguments made to the state courts in support of the post-conviction-relief petition. Additionally, the Court addresses each sub-claim as to Kates's trial counsel individually, and then discusses the sub-claims as to appellate counsel in the aggregate.

1999).  Judge Brown (who was also the trial judge), in turn, rejected each of the above claims as follows after hearing oral argument:

> This Court is satisfied that contrary to [petitioner's] claim, there was no deficient performance of counsel at either the trial or appellate level.  [Petitioner's] claim of deficiency of counsel for the most part suffers from the distorting effects of hindsight, which is cautioned against in *Buonadonna*.[27]  . . .  Here, almost seven years after his conviction, the defendant pieces together separate and in and all of themselves, insignificant actions of trial counsel in an attempt to [mount] a claim of ineffective assistance of trial counsel as a whole.

7T:28:1-16.  This Court finds that Judge Brown's decision was neither contrary to nor an unreasonable application of *Strickland*.  As an initial matter, Kates does not reference the second *Strickland* prong, and thus the claim fails at the outset.  Nonetheless, upon independent review of the trial and appellate record, the individual *Strickland* sub-claims do not meet at least one of the two *Strickland* parameters.

First, Kates argues that trial counsel failed adequately to meet with him prior to trial, and failed to interview his alibi witness at all.  He does not identify, however, how the result of the trial might have been different.  Trial counsel is, of course, under a constitutional obligation thoroughly to investigate the law and facts surrounding a criminal defendant's case.  *Strickland*, 466 U.S. at 691.  Where a habeas petitioner challenges the adequacy of such investigation, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions . . . ."  *Id.*  Here, Kates does not allege that trial counsel failed to meet with him at all, an omission which would change the landscape of this case drastically.  Instead, he admitted to the Appellate Division on his appeal for state post-conviction relief that he met personally with trial counsel once before the trial and spoke with him by

---

[27] *State v. Buonadonna* 22 N.J. 22 (1991).

telephone on several occasions.  An independent review of the trial transcripts plainly reveals that trial counsel was well versed with the facts and the law relevant to the case, and was at all stages—pre-trial motions, trial, and post-trial—prepared to try it.  The Court concludes that trial counsel was not ineffective for failing to investigate the case adequately by personally meeting with Kates on multiple occasions.  In any event, the Court also finds that Kates has suffered no prejudice, because neither he nor his appellate counsel identified with any reasonable specificity or probability how the outcome of the trial might have been different.[28]

As to his trial lawyer's alleged failure to interview Leroy Handy (the alibi witness), Kates fails to establish what further exculpatory testimony Handy would have given had counsel had more contact with him.  Handy testified that Kates could not have been present at the scene of the crime when Martin was stabbed. 3T:88:5-92:12.  While Kates argued to the state post-conviction relief courts that Handy appeared confused about the date on which he was with Kates, Handy's testimony also makes clear that he was certain that he and Kates were together at the time Martin was stabbed, and he gave detailed reasons supporting that belief.  3T:88:15-90:4, 98:2-99:12; 102:1-15.  Having failed to identify what Handy's better-prepared testimony would have been to create a reasonable probability that the trial's outcome would have been different,

---

[28] Appellate counsel in his state collateral appeal argued that trial counsel's failure to investigate the claims by adequately meeting with Kates personally constituted *per se* ineffective assistance under *United States v. Cronic*, 466 U.S. 648, 659 (1987), and thus prejudice should have been presumed under one of three narrow exceptions to *Strickland*.  The Court disagrees.  Relevant here, prejudice will be presumed under *Cronic* only when counsel's deficiency is so "complete" that it "*entirely* fails to subject the prosecution's case to meaningful adversarial testing."  *Cone v. Bell*, 535 U.S. 685, 697 (2002) (quoting *Cronic*, 466 U.S. at 659) (emphasis in *Cone*); *see also Ditch v. Grace*, 479 F.3d 249, 256 (3d Cir. 2007) (*Cronic* "applies only in cases where the denial of counsel would necessarily undermine the reliability of the entire criminal proceeding.").  Trial counsel's performance, as demonstrated by the trial transcripts, was far from such inadequate representation such that the State's evidence was put to no test at all, and thus *Strickland* applies.  Having failed to show prejudice as discussed above, sub-claim (a) fails.

Kates cannot meet the second *Strickland* prong on this portion of sub-claim (a).  *See Campbell v. Burris*, 515 F.3d 172, 184 (3d Cir. 2008) (where petitioner claimed, *inter alia*, that trial counsel had failed to subpoena a "potentially exonerating witness," stating that petitioner "fail[ed] . . . to allege what this witness would have been able to say that would have been of help to him," and that, "[a]s we have previously stressed, a showing of *Strickland* type prejudice may not be based on mere speculation about what the witnesses counsel failed to locate might have said.") (internal quotations omitted); *see also United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989).

Second, Kates complains that trial counsel did not adequately cross-examine Caldwell and Coley on their drug use after Martin had been stabbed in an attempt to question their "recall ability."  Further, he claims that trial counsel erred by failing to introduce an expert witness regarding Caldwell and Coley's memory capability as a result of their drug ingestion.  But this is precisely the type of tactical decision for which *Strickland* does not permit relief.  Both Caldwell and Coley testified that they "got high" upon arriving at the hotel (after the robbery and stabbing), and thus it was reasonably apparent to the jury that such drug ingestion presented bases on which their testimony might be unreliable.  But, as the State points out, one of Kates's two trial theories was that Caldwell, Coley, and Melvin agreed to "pin" the stabbing on him; accordingly, trial counsel might not have wanted to overly emphasize the drug use, lest it appear that they did not at the time have the cognitive ability to concoct such a scapegoat scheme.  *See Thomas v. Varner*, 428 F.3d 491, 500 n.8 (3d Cir. 2005) ("[I]n opposing a petitioner's attempt to disprove the existence of a possible sound strategy, it is entirely proper for the [government] to engage in record-based speculation as to what counsel's strategy might have been.").  Kates fails to show that counsel's strategic decision to avoid emphasis on the drug use satisfies the first

prong of *Strickland.  Gray*, 878 F.2d 702 at 710 (quoting *Strickland*, 466 U.S. at 690-91) ("In the context of defense counsel's duty to investigate, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'")).

Alternatively, Kates fails to demonstrate how the trial's outcome would have been altered had more detailed information been adduced as to Caldwell's and Coley's drug use on October 18, 1999.  As Judge Brown stated when he rejected the claim on the second prong of *Strickland*:

> In addition, the [petitioner] has submitted an expert report which discusses the cognitive effect of cocaine on memory.  As indicated in the colloquy with counsel, the psychiatrist . . . who submitted the report had no opportunity to examine the actual people, either now or at the time, which is more important, at the time of occurrence.  I've had the opportunity to read the report, an extensive report, and I'm convinced that even if this expert testimony was presented during the defendant's trial, the jury verdict would have undoubtedly been the same.

> The report of the psychiatrist that basically indicates that they were high on drugs, they had ingested drugs.  As indicated in the colloquy with counsel, there's actual testimony from the witnesses themselves . . . that at time of the actual occurrence there was no drug ingestion, they were not high on drugs, and the first reference as to why did you stab him, you didn't have to stab the man, words to that effect, attributable from the co-defendant referred to as Heavy, in the car, were words directed toward this defendant.

> And the testimony is that subsequent . . . when they arrived at the motel room, it was then that they ingested a certain amount of cocaine.  Even reviewing the psychiatrist's report in its most favorable way, it's purely speculation that it may have had some effect on the jury verdict. . . .  [T]here is . . .  nothing in the psychiatrist's report that would indicate, even if it did come forward at the time of trial, that the verdict would have been different.  The testimony clearly indicated, from all of the witnesses, this was the defendant who in fact stabbed the victim.

55

7T:28:17-30:11.  The Court concludes that this careful and reasoned analysis defeats sub-claim (b).

Third, Kates challenges trial counsel's failure to ascertain from the State the possible existence of any informal deals or agreements with Caldwell in exchange for her testimony, and his failure effectively to cross-examine her regarding these alleged deals.  But the State is correct that trial counsel did, in fact, press Caldwell at one point on whether the police threatened to charge her with an offense:

> Q.   Now, when the police were talking to you on October 25[, 1990], when you made the statement, did they tell you that you could be charged with [an] offense?
>
> . . .
>
> A.   No.
>
> Q.   They didn't tell you anything about what they were investigating?
>
> A.   They told me –
>
> . . .
>
> Q.   I am sorry, I am going to finish—what they were investigating they thought you might be involved in?
>
> A.   They found out, they knew I wasn't involved, and I am not involved really.
>
> Q.   Did they ever tell you that you could be charged with part of this offense?
>
> A.   No. . . .

2T:163:14-164:7.  Kates argued in support of his petition for state post-conviction relief that this examination, "if anything, conveyed the impression to the jury that she had nothing to gain from her pro-State testimony at trial."  That he did not like Caldwell's answers, however, or that trial

56

counsel did not further pursue this line of cross-examination, is not a basis to find that ineffective counsel was rendered.  *See Andrews v. Deland*, 943 F.2d 1162, 1195 & n.49 (10th Cir. 1991) ("The fact that [counsel] could have attempted to discredit [a witness's] testimony through additional, or alternative, means, does not indicate that his examination . . . was ineffective. . . . It does not matter that, with hindsight, [counsel] could have pursued a different strategy. What matters is that the strategy employed was effectively and competently pursued. . . .").

Having reviewed trial counsel's cross-examination of Caldwell anew, the Court finds that it was competently pursued and thus, was objectively reasonable.  Counsel began his cross-examination by noting that Caldwell had been able to speak with Melvin several times after October 18, 1990 but before she gave her official statement to police seven days later (he also repeated this questioning at the end of his examination).  2T:160:9-161:3, 165:25-166:2.  This line of questioning furthered the tactical attempt to portray Caldwell, Coley, and Melvin as having agreed to "pin" the crimes on Kates.  Consistent with this strategy, counsel then pressed Caldwell on the number of times Melvin had stood as a "lookout" for her and Coley while they solicited themselves.  2T:162:5-1633:13.  He also explicitly attempted to demonstrate that Caldwell was closer to Melvin than she was to Kates:

> Q.     You knew [Melvin] better than you knew Kates, isn't that so?
>
> A.     Yes.

2T:162:7-8.  After pressing her on whether the police had told that she could be charged with an offense, counsel examined Caldwell on her relationship with Coley, and whether she had been able to speak to Coley after the incident.  2T:165:2-24.  This, again, is consistent with counsel's

trial strategy to discredit Caldwell and Coley's testimony on the basis that they were falsely implicating Kates.  And this is the same strategy that counsel summoned in his summation:

> Do you remember Wendy [Caldwell], do you remember I mentioned in my opening, take a look at all the witnesses, see if they could look you in the face when talking to you?  Wendy couldn't look you in the face, above all, couldn't look Mr. Kates in the face.  Why?  Because she knew what she was doing to him, to save her friends who were the ones that were involved.  How it happened, the circumstances, ladies and gentlemen, the proofs in the case and the testimony you have heard, I don't know whether you felt this way but I kept looking for more.  You are sitting here, you are waiting, waiting, waiting, and there is no more.  What does the State produce?  The State produces one individual who gives self-serving statements to her friends, to put it on someone else.

3T:118:23-119:15.  All of this is consistent with the defense theory.  Counsel's tactical decision to pursue one method of attacking Caldwell's testimony over another was not constitutionally impermissible.  *See Andrews*, 943 F.2d at 1195 & n.49; *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir. 1993) ("[A] court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy.").

Fourth, the Court has already rejected Kates's underlying argument that the trial court's accomplice-liability instruction warrants vacatur of his conviction (*see supra* Section III.C.2).  Thus, counsel's alleged failure to request a pristine jury instruction is immaterial, for trial counsel cannot be deemed ineffective for failing to pursue a meritless claim.  *See Parrish v. Fulcomer*, 150 F.3d 326, 328 (3d Cir. 1998).  Judge Brown rejected petitioner's *Strickland* sub-claim as to the jury instructions for this reason as well.  7T:30:12-31:5.  Finding that conclusion reasonable and consistent with *Strickland*, the Court rejects sub-claim (d).

Fifth, before dismissing the juror who believed that she could not impartially carry out her duty, the trial court questioned her as to whether she had informed the other jurors about her

specific knowledge of the neighborhood where the crime occurred, and she answered that she had not.  The trial court rejected Kates's *Strickland* claim on this basis, stating that "the juror in question merely indicated she was familiar with the area. . . .   [T]here was no indication whatsoever that any other jurors either were or even could have been tainted by this person happening to know the area in question."  7T:31:7-11.  Absent any suggestion in the record that the juror disclosed her personal knowledge of the crime scene to the other jurors, counsel had no reason to *voir dire* the remaining jury members, and was not objectively ineffective in failing to do so.  *See Rock v. Zimmerman*, 959 F.2d 1237, 1253 (3d Cir. 1992) ("In the absence of a showing of an 'utterly corrupt' trial atmosphere, the defendant, in order to demonstrate a violation of his right to an impartial jury, must establish that those who actually served on his jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom.") (citing *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)) (other citations omitted).  Sub-claim (e) therefore lacks merit.

Sixth, to the extent each sub-claim alleges that appellate counsel did not raise certain issues (including the accomplice-liability instruction issue, *supra*) that this Court has already rejected, Kates has not met the first *Strickland* requirement:  "[O]n direct appeal, counsel assistance does not become ineffective by failing to raise an issue when convincing Supreme Court case law shows it to be without merit."  *Parrish*, 150 F.3d at 328-29; *see also Moore v. Deputy Comm'rs of SCI Huntingdon*, 946 F.2d 236, 245 (3d Cir. 1991) (holding that trial counsel was not ineffective for failure to object to accomplice-liability instruction where none was justified on basis of the evidence).  As to all other issues regarding appellate counsel, "it is a well-established principle that counsel decides which issues to pursue on appeal."  *Sistrunk v.*

*Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000) (clarifying that appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal"); *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").   The Court has reviewed appellate counsel's brief in support of Kates's appeal, which addressed the following three issues:  (1) the admission of Melvin and Coley's hearsay statements; (2) the trial court's failure to try the three co-defendants separately; and (3) the erroneous accomplice-liability instruction.   Having done so, counsel's performance demonstrably satisfied constitutional safeguards.  Counsel was not duty-bound to assert every issue, and Kates has thus failed to show that appellate counsel's performance fell below an objective standard of reasonableness.

As the Court has discussed, petitioner has failed adequately to allege a deviation from the objective standard of reasonably adequate assistance of counsel on any of his *Strickland* sub-claims.  Therefore, because no single act or decision of counsel deprived Kates of his Sixth Amendment guarantee to effective counsel, the Court concludes that his *Strickland* claim fails in the aggregate as well.

F.

Kates argues in Claim M that "the cumulative effect of all the errors below mandates a reversal in this case."  "Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process.  *Fahy*, 516 F.3d at 205

60

(3d Cir. 2008) (citing *Albrecht v. Horn*, 471 F. 3d 435, 468 (3d Cir. 2006), *vacated on other grounds*, *Albrecht v. Horn*, 2007 U.S. App. LEXIS 8224 (3d Cir. Apr. 10, 2007)).  "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Id.* (quoting *Albrecht*, 471 F.3d at 468) (in turn citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993))).  Having reviewed the record, the Court finds that under the totality of the circumstances, any errors—if errors there were—do not together arise to any prejudicial effect on Kates's state-court conviction.  Relief on this basis is therefore denied as well.

## IV.

The Court next must determine whether a certificate of appealability should issue.  *See* Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if Kates "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Court's review of Kates's claims above demonstrates that he has failed to make such a "substantial showing."  Therefore, it declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

*****

## V.

The judgment of conviction pursuant to which Kates is incarcerated rests upon state-court determinations that were neither contrary to nor involved unreasonable applications of clearly established federal law.  Accordingly, Kates is not entitled to the Great Writ.  His petition is denied, and a certificate of appealability shall not issue.  An appropriate Order will follow.


/s/  Katharine S. Hayden

Hon. Katharine S. Hayden
United States District Judge

Date:  August 27, 2009